
DA 08-0478

IN THE SUPREME COURT OF THE STATE OF MONTANA

2009 MT 98

IN THE MATTER OF

B.S. and G.S.,

    Youths in Need of Care.

APPEAL FROM:    District Court of the Eighth Judicial District,
In and For the County of Cascade,
Cause Nos. DDJ 07-130-Y and DDJ 07-131-Y
Honorable Dirk M. Sandefur, Presiding Judge

COUNSEL OF RECORD:

    For Appellant:

        Jim Wheelis, Chief Appellate Defender;
Koan Mercer, Assistant Appellate Defender; Helena, Montana
(Attorneys for Appellant and Father)

    For Appellee:

        Hon. Steve Bullock, Montana Attorney General;
Jonathan M. Krauss, Assistant Attorney General, Helena, Montana

        Submitted on Briefs:  February 25, 2009

        Decided:  March 31, 2009

Filed:

_____
Clerk

Chief Justice Mike McGrath delivered the Opinion of the Court.

¶1　The father of two minor children, B.S. and G.S., appeals from the termination of his parental rights to those children. We affirm the judgment entered by the Eighth Judicial District Court, Cascade County.

¶2　We restate the issues as:

¶3　1. Was the District Court within its authority to adjudicate B.S. and G.S. as youth in need of care absent a request for that particular relief in the petitions for temporary investigative authority (TIA) and emergency protective services?

¶4　2. Did the court err in finding the Department of Public Health and Human Services (DPHHS) had presented sufficient evidence to establish that B.S. and G.S. were youth in need of care?

¶5　3. Did the court err in denying the father's request for a hearing regarding whether placement with grandparents was in the children's best interests?

¶6　4. Did the court abuse its discretion in terminating the father's parental rights?

¶7　5. Is it necessary to remand this case for an evidentiary hearing regarding whether appointed counsel provided ineffective assistance?

BACKGROUND

¶8　On August 23, 2007, the mother of B.S. and G. S. voluntarily placed the children in DPHHS custody. DPHHS had received reports of domestic violence within the family prior to that time, and the mother, who had obtained a restraining order against the father and custody of the children, was staying at the Mercy Home shelter for domestic abuse victims in

Great Falls, Montana. G.S., who was then 5 years old, had run away from the shelter three times in one day and had been hitting other children there, and the mother was concerned about her inability to handle him or her daughter, B.S., who was then 3 years old.

¶9 DPHHS petitioned for emergency protective services and TIA as to both children. During the month between the mother's placement of the children in DPHHS care and the October 1, 2007 hearing on DPHHS's petitions, criminal charges unrelated to these proceedings were filed against both the mother and the father. At the hearing, the mother stipulated to TIA for up to 90 days. The father, who by that time was incarcerated on the pending criminal charges, contested DPHHS's petitions.

¶10 At the time of the TIA hearing, B.S. was again living with her mother at Mercy Home. G.S. was placed, temporarily, at a children's receiving home, following breakdowns of two foster care placements. DPHHS presented caseworkers' testimony about the family's history of adjudicated domestic abuse in Washington state. A caseworker testified about reports of an August 2007 tug-of-war with both parents pulling on B.S. outside the Great Falls courthouse and the father slamming the mother's hand in the car door. The mother also testified. When she was questioned about her experiences during her marriage to the father, she told the court that, during one argument, the father "had me up against a wall and everything was going black, I felt like my eyes were going to pop out. And I was trying to tell him our son was watching." The mother testified about another incident that occurred when she was living in a domestic violence shelter in Washington state. She and another woman were walking B.S. and the other woman's child down the sidewalk in a stroller when

3

the father drove by and "somehow" drove his car into the stroller. In addition to the above testimony, DPHHS presented testimony by Mercy Home staff members that G.S. exhibited serious behavioral problems, including hitting another boy at the shelter, throwing a toy at another child, and running away from the shelter. One shelter worker stated, "You know, he seems very angry." Finally, the caseworker testified that speech evaluation showed G.S. had a 2-year speech deficit.

¶11    The District Court continued TIA and, sua sponte, based on a preponderance of the evidence presented, found probable cause to believe that B.S. and G.S. were youth in need of care and adjudicated them as such. Shortly thereafter, on DPHHS's motion, the court entered an order in which it found that DPHHS had made reasonable efforts to prevent the removal of B.S. and G.S. from their home.

¶12    The father agreed to a treatment plan prepared by DPHHS and approved by the court. By the date of the dispositional hearing in December of 2007, the father was in federal custody on charges of conspiracy, credit card fraud, identity theft, and fraudulent use of a social security number. At the dispositional hearing, the parties agreed to put most of the father's treatment plan on hold pending disposition of his criminal case, but the father agreed to continue with his treatment plan tasks of staying in contact with the caseworker, signing releases for DPHHS, and maintaining contact with B.S. and G.S. through the DPHHS caseworker. Both parents stipulated to keeping temporary legal custody (TLC) with the State of Montana for 6 months.

¶13    Placement of B.S. and G.S. with the father's sister and her husband in the state of

4

Washington failed when G.S. went to school with severe bruising on his face as a result of reported abuse within that placement. The children were returned to Montana and placed in non-relative foster care. In June of 2008, DPHHS petitioned for permanent legal custody of B.S. and G.S. and for termination of both parents' rights.

¶14 At the time of the August 2008 termination hearing, both parents were incarcerated in federal prisons. Because the District Court was unable to establish a telephone connection allowing the mother to participate in the hearing from prison, the court continued the proceedings as to her, and conducted the hearing as to termination of the father's parental rights only. The father participated in the hearing by telephone.

¶15 The petition to terminate the father's rights was based on failure of his court-ordered treatment plan. Following the hearing, the District Court entered an order in which it found, among other things, that the children had been in state custody since August of 2007; the court had adjudicated the children youth in need of care; the father had not complied with his court-ordered treatment plan in that he had failed to communicate on a monthly basis with his caseworker and, through the caseworker, with his children; and the father was subject to judicially-ordered long-term confinement by the United States government that was not likely to expire until 2012. The court concluded, among other things, that termination of the father's parental rights was in the best interests of the children due to the length of time they had been in foster care, and that the evidence showed, beyond a reasonable doubt, that the father had not complied with an appropriate court-ordered treatment plan and that the conduct of the father rendering him unfit was unlikely to change within a reasonable time,

given his long-term federal incarceration.

DISCUSSION

¶16   *Was the District Court within its authority to adjudicate B.S. and G.S. as youth in need of care absent a request for that particular relief in the petitions for TIA and emergency protective services?*

¶17   The father points out that § 41-3-422(1)(a), MCA, requires that "[p]roceedings under this chapter must be initiated by the filing of a petition" and that § 41-3-437(1), MCA, authorizes a district court to adjudicate a child a youth in need of care (YINC) "[u]pon the filing of an appropriate petition." He argues that, because DPHHS did not request YINC adjudication in its initial petitions for emergency protective services and TIA, the District Court did not have authority to go beyond the relief requested and adjudicate B.S. and G.S. as youth in need of care. In this regard, the father cites several Montana cases relating to abuse and neglect proceedings. *See In re D.A.*, 2008 MT 247, 344 Mont. 513, 189 P.3d 631; *In re T.C.*, 2001 MT 264, 307 Mont. 244, 37 P.3d 70; *In re M.P.M.*, 1999 MT 78, 294 Mont. 87, 976 P.2d 988.

¶18   None of the cases cited by the father addresses the particular argument he raises here. As a result, we examine the applicable statutory language to resolve this issue.

¶19   The relief sought in a petition filed under § 41-3-422, MCA, may include immediate protection and emergency protective services, TIA, temporary legal custody, long-term custody, termination of the parent-child legal relationship, appointment of a guardian, a determination that preservation or reunification services need not be provided, any combination of these, or "any other relief that may be required for the best interests of the

6

child." Section 41-3-422(1)(a), MCA. Additionally, § 41-3-422(1)(b), MCA, allows a petition under the abuse and neglect statutes to be modified for different relief at any time within the discretion of the court. Finally, § 41-3-432(9), MCA, allows a court to adjudicate a child a youth in need of care at the show cause hearing for immediate protection and emergency protective services. Based on these statutes, we conclude the form of the petition and the relief sought therein did not foreclose the court from making a YINC adjudication when it did.

¶20 We hold the District Court possessed authority to adjudicate B.S. and G.S. as youth in need of care.

¶21 *Did the District Court err in finding DPHHS had presented sufficient evidence to establish that B.S. and G.S. were youth in need of care?*

¶22 For a court to adjudicate a child a youth in need of care, the State must present evidence sufficient to establish that the child has been abused, neglected, or abandoned. Sections 41-3-102(34) and -422(5)(a), MCA. An adjudication that children are youth in need of care must be based on a preponderance of the evidence, must determine the nature of the abuse and neglect, and must establish facts that resulted in state intervention and upon which disposition, case work, court review, and possible termination are based. Section 41-3-437(2), MCA. The court must make written findings on issues including which allegations of the petition have been proved or admitted, if any, whether there is a legal basis for continued court and DPHHS intervention, and whether DPHHS has made reasonable efforts to avoid protective placement of the child or to make it possible to safely return the child to the child's home. Section 41-3-437(7)(a), MCA.

7

¶23 Although DPHHS took the position at the October 2007 hearing that it did not yet have sufficient evidence to establish by a preponderance of the evidence that the children were youth in need of care, the court found otherwise. Based on the evidence at the TIA hearing, the District Court found there was a significant prior history of domestic violence and domestic dispute between the parents in the presence of the children. It found the mother left the family home with the children in August of 2007 and began staying at the Mercy Home as a result of her distress with the father's conduct and her own mental health conditions. The court made detailed findings about the domestic abuse incidents about which testimony had been presented. The court also found:

> Whether it be linked or whether it has occurred independent of the domestic hostility and violence between the parents, [G.S.] has exhibited various behavior and developmental problems, including frequent escapes or run aways, from the custody of the parent or supervisors, violent behavior by throwing toys and pushing and hitting either a sibling or other children. The child also exhibits anger control problems and poor language skills for his age.

In addition, the court found the father could not care for the children because of his incarceration, and the mother, who was living at the Mercy Home and dealing with her own mental health issues, had voluntarily surrendered the children to DPHHS care due to her inability to adequately parent them. The court found DPHHS had made reasonable efforts to avoid placement of the children or to make it possible to safely return the children to the home, and that protective placement was required. Contrary to what the father argues on appeal, we conclude the facts set forth in the District Court's findings were sufficient to establish by a preponderance of the evidence that the children were youth in need of care.

¶24 We hold the District Court did not err in finding that DPHHS had presented sufficient

8

evidence to establish that the children were youth in need of care.

¶25 *Did the court err in denying the father's request for a hearing regarding whether placement with grandparents was in the children's best interests?*

¶26 During his testimony at the termination hearing, the father asked the District Court to delay its final determination on terminating his parental rights until a hearing could be held at which his mother (the paternal grandmother of B.S. and G.S.) could testify regarding placement of the children with her and her husband. The District Court did not grant that request.

¶27 A trial court's decision on whether to grant a continuance in an abuse and neglect action is a matter of discretion. *In re O.A.W.*, 2007 MT 13, ¶ 76, 335 Mont. 304, 153 P.3d 6. The caseworkers testified DPHHS had looked into placement with the paternal grandmother when the children were first placed in state custody, but had rejected that as a placement option based on a prior sexual abuse claim against the grandmother's husband. The matter of possible placement with the grandmother and her husband was not a new issue. As noted, a placement of the children with the father's family members in Washington state had failed and Washington state officials had returned the children to Montana. Further, the question of possible placement with the paternal grandmother had no bearing on whether the statutory criteria for terminating the father's parental rights had been established—which, as discussed below, was the purpose of this hearing.

¶28 We hold the District Court did not abuse its discretion in denying the father's request for a continuance to allow for a hearing regarding whether placement with grandparents was in the children's best interests.

9

¶29 *Did the court abuse its discretion in terminating the father's parental rights?*

¶30 Under the statutory circumstances pertinent to this case, a district court may terminate an individual's parental rights if it finds by clear and convincing evidence that (1) the child has been adjudicated a youth in need of care; (2) an appropriate court-approved treatment plan has not been complied with or has not been successful; and (3) the conduct or condition rendering the parent unfit is unlikely to change within a reasonable period of time. Section 41-3-609(1)(f), MCA.

¶31 The father argues the District Court should have exercised its discretion to place B.S. and G.S. in long-term DPHHS custody, instead of terminating his rights, on the basis that terminating his rights was not in the children's best interests. He contends the court should have allowed the children to continue their relationship with their "loving, but temporarily absent, father."

¶32 The father is correct that the best interests of the child are a critical factor in termination proceedings; the statutes give priority to the best interests of the child as the primary and paramount statutory standard for termination. Section 41-3-609(3), MCA, requires the district court to give "primary consideration to the physical, mental, and emotional conditions and needs of the child." Section 41-3-101(4), MCA, provides that the child's health and safety are of paramount concern. The best interests of the child take precedence over parental rights, and the need for permanent placement in a loving and stable home supersedes the parents' interests. *In re A.T.*, 2006 MT 35, ¶ 20, 331 Mont. 155, 130 P.3d 1249.

¶33    The father relies on § 41-3-445(8)(e)(iv) and (v)(C), MCA, to support his argument for long-term custody as opposed to termination of his parental rights. That reliance is misplaced. Section 41-3-445(8)(e), MCA, applies to circumstances in which a child already is in a "planned permanent living arrangement," which is not the case here.

¶34    Further, while the father claims a "complete absence" of substantial evidence regarding the particular conditions and needs of B.S. and G.S., we note the District Court heard not only the evidence presented at the termination hearing, but also the evidence presented at the TIA hearing and the dispositional hearing, including testimony concerning G.S.'s behavioral and developmental difficulties. Throughout these proceedings, the court was kept informed of G.S.'s placements and placement failures in a series of foster homes and at Shodair Children's Hospital, an inpatient treatment center for children with severe emotional illness. That evidence was surely indicative of G.S.'s particular conditions and needs.

¶35    Finally, the father points out, and DPHHS concedes, the District Court erred in relying, in part, on the statutory presumption in favor of termination after children have been in foster care for 15 of the most recent 22 months. DPHHS admits B.S. and G.S. had been in foster care for only 12 months at the time of the father's termination hearing. However, given the father's projected prison discharge date in 2012, the presumption would be triggered before his release from custody.

¶36    Under these circumstances, we hold the father has not established that the District Court abused its discretion in terminating his parental rights.

11

¶37 *Is it necessary to remand this case for an evidentiary hearing regarding whether appointed counsel provided ineffective assistance?*

¶38 The father argues this case should be remanded for consideration of whether he received ineffective assistance of counsel, relying on a parent's right to the effective assistance of counsel in termination proceedings as recognized in *In re A.S.*, 2004 MT 62, ¶ 20, 320 Mont. 268, 87 P.3d 408. In making this argument, counsel for the father acknowledges he has been unable to locate a decision of this Court specifically addressing an ineffective assistance claim relating to termination proceedings where the claims are based, in part, on events or omissions outside of the record on appeal. He analogizes to a civil commitment case, *In re K.G.F.*, 2001 MT 140, 306 Mont. 1, 29 P.3d 485, in proposing that we remand for a fact-finding hearing on his claims.

¶39 In *In re A.S.*, ¶ 26, we determined claims of ineffective assistance of counsel in cases involving the termination of parental rights should be evaluated on the basis of two factors: counsel's training and the adequacy of counsel's advocacy. The father's claims about testimony he could produce on remand all address the second of these factors, the adequacy of his counsel's advocacy. The father states his mother (the grandmother of B.S. and G.S.) would testify that she heard the father speak with B.S. and G.S. by telephone while they were placed with the father's sister in Washington state; he contends this would prove that he completed the "maintain contact with his children" task of his treatment plan. The father also states his mother would testify that she had in the past provided care for the children for several months at a time; he contends this would establish that his mother's home was a suitable placement for the children during his incarceration. The father says his mother

12

would testify that the allegation of abuse against her husband was made in the mid-1990s by her teenage daughter and has since been recanted. Further, the father says if B.S. and G.S.'s mother had been called to testify at the termination hearing, she would testify that she was on medication and participating in therapy while in custody. The father also says he would testify that his trial counsel failed to communicate with him adequately, and that all of this testimony he could produce on remand would establish that his counsel failed to adequately advocate for him.

¶40 The father's treatment plan task required him to maintain contact with B.S. and G.S. through the DPHHS caseworker, not through his mother. Moreover, as we have stated above, whether the children might be placed with their paternal grandparents or other relatives was irrelevant as to whether statutory criteria for termination of the father's parental rights had been established. The same is true of the claimed evidence of the mother's therapeutic progress—it would be irrelevant as to whether statutory criteria for termination of the father's parental rights had been established. As a result, we conclude counsel's claimed failure to act to produce the testimony the father has described did not constitute inadequate advocacy. We further conclude it is not necessary to remand this case for a hearing concerning the father's claims of ineffective assistance of counsel.

¶41 We affirm the judgment entered by the District Court.

/S/ MIKE McGRATH

We concur:

/S/ JAMES C. NELSON

13

/S/ W. WILLIAM LEAPHART
/S/ PATRICIA COTTER
/S/ BRIAN MORRIS